## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DeANDRE GREEN,              )

                      )

          Plaintiff,      )

                      )      CIVIL ACTION

v.                      )      Case No.: 12-CV-3158-DDC-KGS

                      )

ASHLEY McKEEN, *et al.*,    )

                      )

          Defendants.    )

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Tracy Johnson, Patrick Mansfield, and Efrain Rueda, by and through Assistant Attorney General John Wesley Smith, respectfully submit this Memorandum in Support of Defendants' Motion for Summary Judgment in accordance with D. Kan. Rules 7.1(a) and 7.6. Defendants request this Court enter summary judgment on their behalf on the basis of qualified immunity, and state the following in support:

### NATURE OF CASE AND MATTER BEFORE THE COURT

Plaintiff DeAndre Green is a former inmate who alleges he was subjected to excessive force in violation of his Eighth Amendment rights while incarcerated at the El Dorado Correctional Facility in Butler County, Kansas. He filed this suit under 42 U.S.C. § 1983, seeking money damages and attorney's fees against the corrections officers in their "individual and representative" capacities. Plaintiff's official capacity claims have since been dismissed, as has his individual capacity claim against former-defendant Ashley McKeen. (Doc. 23); (Doc. 38). The remaining defendants now ask that the Court enter summary judgment on their behalf since they are entitled to qualified immunity on the remaining individual capacity claims.

## STATEMENT OF FACTS

### Facts regarding the parties and claims

1. Plaintiff, DeAndre Green, is a former inmate and citizen of Kansas who presently resides at 1445 N. Broadview St., Wichita, Kansas 67208. (Doc. 1, Compl. at 1).

2. Plaintiff first entered state custody at the El Dorado Correctional Facility ("EDCF") on February 1, 2010, after repeatedly violating the terms of his probation. (Ex. 1, KDOC Use of Force Report No. 11-008, at 9) (stating convictions and date of custody).

3. Specifically, Plaintiff's probation was revoked because of four new felony convictions for failing to register in Sedgwick County Case No. 08CR3400, and for repeatedly submitting falsified reports and documentation to his probation officer regarding his employment, community service, and participation in sex offender treatment. (Ex. 2, Green Dep., 218:16) (admitting to falsification); (Ex. 3, Nunc Pro Tunc Journal Entry of Probation Violation Hearing from Sedgwick County Case No. 06CR1153, at 2).

4. Defendant Efrain Rueda was at all times relevant to this suit employed by the Kansas Department of Corrections ("KDOC") as a Corrections Officer I at EDCF. (Doc. 1, at 2); (Ex. 4, Rueda Dep., 9:22).

5. Defendant Tracy Johnson, although currently retired, was at all times relevant to this suit employed by the KDOC as a Corrections Officer I at EDCF. (Doc. 1 at 1-3); (Ex. 5, Johnson Dep., 9:23).

6. Defendant Patrick Mansfield was at all times relevant to this suit employed by the KDOC as a Lieutenant at EDCF. (Doc. 1 at 2); (Ex. 6, Mansfield Dep., 15:13).

7. In his Complaint, Plaintiff alleged that, because of threatening statements he made to Officer Ashley McKeen, with whom Plaintiff also alleged Lt. Mansfield was having an

affair, Lt. Mansfield ordered officers Johnson and Rueda to beat him via a coded message: "turn Green around." (Doc. 1, Compl. at 3-4).

8. In the Pretrial Order, Plaintiff's allegations against Lt. Mansfield are limited to: (1), that he ordered Officers Johnson and Rueda to bring Plaintiff to his office; (2), that he sent him to segregation thereafter; and (3), that "Mansfield's office" ordered the escorting party to turn around and return to the captain's office. (Doc. 85 at 3-4).

9. In the Pretrial Order, Plaintiff generally alleged Officers Johnson and Rueda violated his rights under the Eighth Amendment with three separate uses of force on July 21, 2010: (1) hitting Plaintiff's head on the door leading out of the captain's office and the west gym doors leading outside while escorting him to segregation; (2), throwing Plaintiff to the ground and thereafter tasing him with an electronic stun device and repeatedly punching and kicking him outside the west gym doors; and (3), stepping on Plaintiff's leg restraints in the strip-out room in the segregation cell house. (Doc. 85 at 3-4).

**Facts regarding the July 21, 2010, escort of Plaintiff**

10. On July 21, 2010, Plaintiff was written a disciplinary report by Corrections Officer Ashley McKeen for making a threatening or intimidating statement. (Ex. 2, Green Dep. 68:22); (Ex. 2, Green Dep. at ex. 2, Disciplinary Report No. 10-07-132).[1]

11. Specifically, Plaintiff shouted at Officer McKeen to open a door, and when she told him not to use inappropriate language, Plaintiff repeatedly threatened "remember what you started, this is on you." (Ex. 2, Green Dep. at ex. 2, Disciplinary Report No. 10-07-132).

---

[1] Throughout this memorandum, exhibits marked at depositions are attached to their respective deposition and cited to with a lowercase "e" in an attempt to avoid confusion.

12. As is his usual practice, after receiving the report Lt. Mansfield ordered Special Security Team Officers Rueda and Johnson to retrieve Plaintiff from his cell house and bring him to his office to give his side of the story. (Ex. 6, Mansfield Dep. 110:15-24, 112:19).

13. Officers Johnson and Rueda retrieved Plaintiff as ordered, placing handcuffs but no leg restraints on Plaintiff for the escort. (Ex. 4, Rueda Dep, at ex. 7, UOF Video Compilation folder, file "20100721_1243_#7.avi").

14. Soon after arriving and entering the captain's office, Plaintiff became agitated and threatened Lt. Mansfield with violence, stating "I'll get down with you, you fat mother fucker." (Ex. 2, Green Dep., 22:14-23:10); (Ex. 2, Green Dep. at ex 21, Call No. 24631874 at 17:40, 25:32) (admitting that he "threatened him" stating "man I'll whoop your fat motherfucking ass . . . I'll beat your fat motherfucking ass").

15. At this point, Lt. Mansfield decided that his business with Plaintiff was done, and he ordered the escorting officers to take Plaintiff to segregation. (Ex. 6, Mansfield Dep., 126:14, 171:6-176:10).

16. Lt. Mansfield did not see Plaintiff again after he was escorted from his office on July 21, 2010. (Ex. 6, Mansfield Dep., 108:9, 126:14) ("I was not at the location where [Plaintiff was put on the ground]." "I gave them the directive to leave my office with Mr. Green and proceed to a segregation unit which would have been on the west side of the compound. That is the direction that they were going the last I knew." ).

17. On the way out of the captain's office, Plaintiff became more combative, turning back towards Officer Johnson and Lt. Mansfield in direct violation of orders to "face forward" and exit the office. (Ex. 4, Rueda Dep., 34:9); (Ex. 4, Reuda Dep. at ex 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:54:27); (Ex. 2,

Green Dep. at ex. 4, Disciplinary Report 10-07-134) (stating Plaintiff began to turn his body after being ordered by Officer Johnson to face forward); (Ex. 5, Johnson Dep., 20:18-21:13) (testifying that Plaintiff was at first "angling back" and subsequently turned quick, and Officer Johnson was afraid he was going to spit on him or Lt. Mansfield).

18. In response to Plaintiff's escalation, Officers Rueda and Johnson engaged an alternate escorting procedure while exiting the office: putting their arms through Plaintiff's cuffed arms with their hands on his shoulders in order to lean Plaintiff forward and effect better control and leverage of the resisting Plaintiff. (Ex. 4, Rueda Dep., 34:9, 72:18).

19. During this time, Plaintiff was combative and resisted walking. (Ex. 4, Rueda Dep., 40:19-41:8, 70:16-71:6); *see also* (Ex. 2, Green Dep. ex. 21, Call No. 24648111 at 11:30 (Plaintiff testifying under oath at his disciplinary hearing that he was having trouble walking due to the alternative escorting procedure employed); *and* (Ex. 2, Green Dep. at ex. 1, Pl.'s Undated Ltr., at AG 567) (stating his belt "popped" when he was bent forward and his pants were falling down at the time).

20. Video of the incident clearly shows that Plaintiff's head did not strike the door leading out of the captain's office. (Ex. 4, Rueda Dep. at ex 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:54:25-30). The door in question swings inward into the office and was already behind Officer Rueda standing to Plaintiff's right when Plaintiff exits without trouble. (*Id.*).

21. The second set of doors through which Plaintiff proceeded, referred to as the west gym doors, are free-swinging, i.e. they do not have a latch on them. (Ex. 4, Rueda Dep., 69:9).

22. While escorting Plaintiff through the west gym doors, Officer Rueda opened the west gym doors with his forearm, and did not use Plaintiff's head as a battering ram to open

the doors as alleged in the Complaint. (Ex. 4, Rueda Dep., 35:10, 68:25); (Ex. 4, Rueda Dep. at ex. 5); (Ex. 5, Johnson Dep. at ex. 4, AG 9, AG 11).

23. This is consistent with the security video, which, while not catching Plaintiff's egress through the doors, does depict Officer Johnson to be the last person through the doorway. (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:54:25-36).

24. Plaintiff exited the west gym doors heading in the direction of the segregation cell houses. (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1254_#12.avi" at time stamp 12:54:35) (camera angle from outside the doors); (Ex. 6, Mansfield Dep., 126:14) (testifying they were headed in the direction of the segregation units);

25. Meanwhile in the captain's office, Lt. Randy Sherman ordered Corrections Officer Tamara Samuels to go get the escort party and to tell them to return Plaintiff to the captain's office. (Ex. 7, Samuels Dep. at ex. 2); (Ex. 4, Reuda Dep., 28:15).

26. Lt. Sherman ordered them to return after they had been dismissed because he was confused as to whether a checklist necessary to place an inmate in segregation had been completed. (Ex. 8, Sherman Dep., 13:14-14:8).

27. KDOC Internal Management Policy and Procedure ("IMPP") Nos. 20-103 and 20-105 require that a form entitled "Checklist Of Possible Self-Harm Indicators" be completed for all inmates placed in segregation, in addition to the inmate being cleared by medical staff. KDOC IMPP 20-103, *available at* https://www.doc.ks.gov/kdoc-policies/AdultIMPP/chapter-20/20103.pdf; KDOC IMPP 20-105, *available at* http://www.doc.ks.gov/kdoc-policies/AdultIMPP/chapter-20/20105.pdf.

28. Surveillance video shows that Officer Samuels exited the captain's office approximately twenty seconds after the escort party, and proceeded to stand in the west gym doorway. (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:54:49-53); (*Id.* at file "20100721_1254_#12.avi") (showing she stays in the doorway).[2]

29. Officer David Conner and Lt. Sherman followed Officer Samuels out of the office and to the same location after approximately twelve and fifteen seconds, respectively (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:55:02-12:55:08).

30. Moments after exiting the west gym doors, Officers Johnson and Rueda turned around in response to the order, and came back to the doors whence they just emerged. (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1254_#12.avi" at time stamp 12:54:06 to 12:54:29) (showing Plaintiff returning to the doors after approximately fourteen seconds).

31. Upon returning to the west gym doors, Plaintiff was perceived by Officers Rueda, Johnson, and Samuels to attempt to kick his left foot at Officer Johnson. (Ex. 4, Rueda Dep., 40:12); (Ex. 1, Use of Force Report No. 11-008 at 2, 5); (Ex. 5, Johnson Dep., 27:19-28:2, 36:8) (testifying he perceived Plaintiff to be a threat at the time because he was "flailing" and "flopping" around, cussing, throwing his head, and trying to kick him); (Ex. 7, Samuels Dep. at ex. 2, stating she was holding the door when Plaintiff "decided not to walk and it appeared he was kicking backwards towards the officers").

32. In response, Officer Rueda forced Plaintiff to the ground, and gained control of Plaintiff's legs while Johnson took control of his upper body. (Ex. 4, Rueda Dep., 76:12-77:7)

---

[2] It should be noted that the time stamps for the two main  cameras angles appear to be off by about thirty seconds.

(testifying that while he maintained the alternative escorting procedure with his left arm, he came across Plaintiff's back with his right arm and just used Plaintiff's momentum to place him on the ground).

33. However, no punches, kicks, or stun devices were deployed by Officers Johnson or Rueda. (Ex. 4, Rueda Dep., 36:1, 73:13); (Ex. 7, Johnson Dep., 40:14-16); (Ex. 7, Samuels Dep. at ex. 2) (describing that while Plaintiff was on his stomach on the ground, Officer Rueda crossed Plaintiff's legs behind his back while Officer Johnson held his head by placing his knee on his shoulder); (Ex. 9, Reuda Aff.).

34. Plaintiff testified at his Deposition that he in fact does not recall who allegedly tased him, (Ex. 2, Green Dep., 31:17), nor who kicked or hit him. (Doc. 33:12-14).

35. Approximately thirty seconds after the escort party returned to the west gym doors and Plaintiff was put on the ground, Officer Troy Carrell responded from the west. (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1254_#12.avi" at time stamp 12:54:30).

36. Although initially jogging to where he heard yelling and cursing, Officer Carrell slowed to a walk as he approached because at that point "he could see that Plaintiff still had his restraints on and no struggle or fight was occurring." (Ex. 10, Carrell Narrative Report at 1-2, marked as AG 21-22) (stating that Plaintiff was lying on his chest with Officers Johnson and Rueda at his side maintaining control of him).[3]

37. From inside, Officer David Conner and Lt. Sherman arrived at the location approximately fifteen and twenty seconds after Plaintiff re-arrived at the west gym doors, respectively. (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1248_#4

---

[3] For summary judgment, the parties have stipulated to the admissibility of the narrative reports and statements contained in KDOC's EAI Investigative File No SM-10-0257-07, bates stamped in this case from AG 01 to 116 (excepting the compilations of telephone records marked AG 110, 111, 112, and 113). (Doc. 85 at 3).

2.avi" at time stamp 12:55:06, 12:55:11) (accounting for the fourteen seconds it took the escort party to travel west and return to the doors). Both observed no punching, kicking, tasing, or other abuse of the Plaintiff. (Ex. 8, Sherman Dep. at ex 2); (Ex. 11, Conner Email Statement, marked as AG 19).

38. After the supporting officers arrived, Plaintiff was turned onto his side while it was decided to take him back to the clinic to get him checked out after the use of force. (Ex. 10, Carrell Narrative Report, marked as AG 22).

39. Security footage then shows that Plaintiff reentered the west gym doors in route to the clinic approximately two minutes after his initial exit. (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:56:31).

40. KDOC policy requires that photos be taken of an inmate immediately after a use of force and once every twelve hours for the next 48 hours. (Ex. 8, Sherman Dep, 30:21-32:23).

41. Photos taken of Plaintiff from immediately after the incident, depict no significant injuries and are wholly inconsistent with Plaintiff's allegations that he was brutally beaten, kicked, and tased. (Ex. 14, DVD marked AG 115).

42. Plaintiff actually showed-off for the camera by flexing his muscles after he had been placed in the strip out cell immediately after the incident. (*Id*. at "pic 106.jpg").

43. The Federal Bureau of Investigation in conjunction with the Department of Justice conducted an investigation in response to Plaintiff's allegations of excessive force in this case. (Ex. 21, O'Brien, Written Statement, marked as AG 33 – 35).

44. On April 4, 2011, the United States Attorney's Office, District of Kansas, declined to prosecute either Officer Rueda or Officer Johnson for "any type of civil rights violation." (*Id*.).

**Facts regarding Plaintiff's allegation of twisting or stepping on his leg restraints**

45. Plaintiff alleges that Officer Rueda stepped on his leg restraints while in the strip out room in C-Cell House. (Doc. 85 at 4); (Ex. 2, Green Dep., 46:8-48:12) (specifying Officer Rueda).

46. Officer Rueda denies intentionally stepping on Plaintiff's let restraints in the strip-cell. (Ex. 4, Rueda Dep., 74:8).

47. The security video of the incident shows Plaintiff entering the strip-out room, preceded by Officer David Lewis, and followed by Officers Johnson, Rueda, Casey Gates, Troy Carrell, and Joshua Cleveland, respectively. (Ex. 4, Reuda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1308_#11.avi" at time stamp 13:08:27).

48. The camera angle does not view inside the cell, however, and loses view of Plaintiff once he enters the cell with Officers Johnson, Rueda and Gates. (*Id*. at time stamp 13:08:44).

49. In the strip cell, Plaintiff was placed with his face in the corner against the wall with Officers Rueda and Johnson maintaining control of his arms while Officer Gates removed his leg restraints. (Ex. 2, Green Dep., 46:8-48:12); (Ex. 10, Carrell Narrative Report); (Ex. 4, Rueda Dep., 73:22); (testifying he placed his arm across his back).

50. Although Plaintiff was not physically resisting at this time, he continued making verbal threats and abusive statements. (Ex. 5, Johnson Dep., 95:14); (Ex. 10, Carrel Narrative Report); (Ex. 19, Lewis Email Statement, marked as AG 25) (quoting Plaintiff as stating "Yeah you mother fuckers are real tough when I have these cuffs on. Let's take these cuffs off and let's see how tough you are" And "You bitches better hope you don't see me on the streets").

51. When officers remove leg restraints with an inmate up against a wall, they have the inmate lift one leg up off the ground while the other officer places their foot or leg behind the inmate's opposite foot on the ground. (Ex. 4, Rueda Dep., 54:9).

52. Officers Johnson and Rueda utilized this procedure because of Plaintiff's combative behavior while Officer Gates proceeded to remove the leg restraints. (*Id.* at 49:1, 73:22-74:5); (Ex. 19, Lewis Email Statement); (Ex. 4, Reuda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1308_#11.avi" at time stamp 13:09:05) (showing Officer Gates bending down approximately twenty seconds after Plaintiff enters the cell); (Ex. 20, Gates Narrative, marked as AG 23) (admitting he was the officer who removed the leg restraints).

53. The officer or officers who put the leg restraints on Plaintiff actually put them on upside down. (Ex. 2, Green Dep., 45:21).

54. It was after the Officers noticed the misapplication of the leg restraints that Plaintiff testified an unspecified officer began "twisting" the leg restraints. (Ex. 2, Green Dep., 45:21).

55. However, the leg restraints were locked loosely enough that Officer Gates was able to "turn them" with no real force or effort. (Ex. 19, Lewis Email Statement).

56. The surveillance video shows that, after approximately forty five seconds, Officer Gates finished removing the restraints and stood back up. (Ex. 4, Reuda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1308_#11.avi" at time stamp 13:09:50); (Ex. 20, Gates Narrative Report).

57. Thereafter, Officer Gates proceeded to "scrape the floor [with his boot] to remove the clothes from the strip cell." (Ex. 4, Reuda Dep. at ex. 7, UOF Video Compilation folder,

file "20100721_1308_#11.avi" at time stamp 13:09:50); (Ex. 20, Gates Narrative Report).

## Facts regarding Plaintiff's alleged injuries

58. The KDOC contracts with the independent company Corizon, and formerly Correct Care Solutions, to provide medical and mental health services for its inmates. (Ex. 12, Hoffman Dep., 7:13); (Ex. 13, Smith Aff., ¶2).

59. Plaintiff was assessed by medical staff immediately after the incident outside the west gym doors on July 21, 2010. (Ex. 13, Smith Aff. at AG 462).[4]

60. Although Plaintiff offered subjective complaints that his ankle was "broken," he was "dropped on his head," and his wrists hurt, medical staff noted that he walked into the clinic without a limp and ultimately found "no visible injuries" and "no visible head trauma." (Ex. 13, Smith Aff. at AG 462).

61. Plaintiff was assessed again by medical staff on July 23, 2010. Plaintiff complained generally of pain and that his right ankle and both wrists were broken; medical staff again found no evidence of injury besides a "small abrasion on [Plaintiff's] chin." (*Id*. at AG 459-460).  Plaintiff was prescribed ibuprofen for his pain. (*Id*.).

62. Three days later, on July 26, 2010, Plaintiff was again examined by medical staff after complaining that his abdomen hurt, his ankles were swollen, he had taser marks on his back, and his knees were "popping." (*Id*. at AG 456). Medical staff again found "no visible trauma" and noted only the one inch abrasion under Plaintiff's chin and a 1 centimeter abrasion on his right ankle that were "healing well." (*Id*.). No other bruising or marks on his back, abdomen, or hands were found. (*Id*.).

---

[4] The excerpt of Plaintiff's medical records attached to Smith's affidavit appear in reverse chronological order, thus the higher bates stamped number are earlier in chronological time.

63. On this same day, EAI Investigator took thirty eight (38) photographs of Plaintiff to document his condition. (*Id.*); (Ex. 15, DVD marked as AG 114).

64. The photos taken July 26, 2010, depict no significant injuries and are wholly inconsistent with Plaintiff's allegations that he was brutally beaten, kicked, and tased. (Ex. 15, DVD marked AG 114).

65. On July 28, 2010, emergency orders were entered after Plaintiff complained of acute chest and back pain. (Ex. 13, Smith Aff. at AG 451-454).

66. Plaintiff initially stated that these conditions had been going on for three days, and later stated that it had been going on since the use of force on July 21, 2010. (*Id.* at AG 451).

67. At his deposition, Plaintiff testified that although he thought he was suffering from a medical emergency, after medical staff put him on a liquid diet he "realized" that he was not hurt that bad. (Ex. 2, Green Dep., 102:21-105:11).

68. Accordingly, Plaintiff reported to medical staff that he was "doing fine" the following day. (Ex. 13, Smith Aff. at AG 449).

69. Although they were not medically indicated, (*Id.* at AG 436), x-rays later performed on his chest and spine were returned within normal limits. (*Id.* at AG 432).

70. Plaintiff was again examined on September 1, 2010, with the following findings:

> Inmate is a 22 y.o. Afro-American male who comes to Sick Call today with complaints of neck, back, and rib pain. He was involved in an altercation with SST officers of 7/21/2010…He tells me that the pain is so bad he is having trouble sleeping at night. He is on Tylenol and ibuprofen, but he tells me it doesn't help. He tells me that all of the above have been hurting since the altercation on 7/21/2010. In addition, he tells me his hips, knees, and ankles "pop." He tells me his hands and feet are numb, but can't really explain how long that has been bothering him. He tells me he has a lump over his left ear, which is tender. He does not tell me whether or not he was hit in the head, in fact, he is rather vague about the nature of all his injuries.

Inmate is athletic-appearing and thin. [Nothing abnormal is detected] His affect seems calm for the level of pain he says he's in. His gait is normal despite being shackled at the wrists and ankles. He is highly suggestible in that he doesn't tell me his hands and feet are numb until I ask him…I see no bumps of ecchymosis of the scalp…Neck is supple with good [range of motion]. He has good strength with rotation of the head against resistance, although he gives a poor effort…Knees show no edema or erythema…Ankles show no edema…

X-rays of the chest, lumbar, and cervical spines are obtained. These are [within normal limits]. Inmate can continue on ibuprofen and Tylenol for now. I don't have anything else to offer him for pain; Lortab certainly is not indicated for his pain. Due to inmate's suggestible nature, and due to the fact that he is a poor historian, it is difficult to assess the true nature of his injuries…His injuries do not appear to be severe at all. I think over time his pain will slowly resolve.

(*Id.* at AG 432); *see also* (Ex. 2, Green Dep., 120:4-122:3) (testifying that he had a swollen "bump" on his head after the incident, that was "basically a scar" as well as an "open wound" that one could not see because "it had hair growing over it").

71. Plaintiff's mental health evaluations also demonstrate he did not suffer traumatic physiological injury as a result of the July 21, 2010. *See e.g.* (*Id.* at AG 259) (stating that Plaintiff's self-reported symptoms of PTSD and depression appear exaggerated relative to his clinical presentation and are consistent with immature attempts to manipulate others for secondary gain, noting Plaintiff inquired as to how to apply for SSDI based on his PTSD diagnosis, and concluding that Plaintiff was providing unreliable self-report information with no observable signs of his conditions).

**Facts regarding Plaintiff's perjury**

72. Plaintiff testified that he was tased by either Officer Johnson or Rueda after he was thrown to the ground outside the west gym doors. (Ex. 2, Green Dep., 30:2-32:1).

73. Plaintiff further testified that thereafter, he was bleeding from the spot on his lower back where he claims he was tased. (Ex. 2, Green Dep., 53:10, 40:11) (testifying that his back

was "scarred from the tasing" immediately after the incident when he was being evaluated by medical staff on July 21, 2010).

74. The only electronic stun devices used within the facility at that time did not contain projectile dart cartridges and did not break one's skin or cause bleeding upon application. (Ex. 16, McGuire Aff., ¶¶4-5).

75. The Stinger electronic stun devices record each date and time they are fired, and the printouts from the units indicate no gun was fired on July 21, 2010. (Ex. 17, McGuire Dep., 18:23); (Ex. 17, McGuire Dep. at exs. 1-9, Stinger Reports).

76. In July of 2010, only officers with the rank of COII were permitted to carry the Stingers within EDCF, (Ex. 16, McGuire Aff., ¶6), and both Officers Johnson and Rueda were COI rank at the time. (Ex. 4, Rueda Dep., 9:22); (Ex. 5, Johnson Dep., 9:23).

77. Officer Johnson and Rueda both testified that they were not even carrying an electronic stun device on July 21, 2010. (Ex. 5, Johnson Dep., 84:21, 95:22) (testifying he never deployed an electronic stun device during his employment at EDCF); (Ex. 9, Rueda Aff., ¶3).

78. Plaintiff did not initially report any alleged use of an electronic stun device during his multiple examinations by medical and mental health workers immediately after the incident and later on July 23, 2010. (Ex. 13, Smith Aff., at AG 458-463).

79. During Plaintiff's disciplinary hearing on July 23, 2010, he testified under oath about the incident and never claims to have been tased. *Compare* (Ex. 2, Green Dep. at ex. 21, Call No. 24648111) *with* (Ex. 2, Green Dep., 86:4) (testifying at his deposition that "[he] brought up that they tased [him]" during his disciplinary hearing).

80. In fact, it was not until July 26, 2010, that Plaintiff complained to medical staff that he had taser marks on his back. (Ex. 13, Smith Aff., at AG 456).

81. Yet after examination, Plaintiff was found to have no bruising or marks on his back or abdomen. (*Id.*); (Ex. 18, Bahm Email Statement, marked as AG 28).

82. At his deposition, Plaintiff testified that his statement to Lt. Mansfield - "I'll get down with you, you fat motherfucker" – was, in fact, not a threat and that he only meant he wanted to argue with the Lieutenant. (Ex. 2, Green Dep, 22:14-23:10).

83. This testimony is directly contradicted by Plaintiff's multiple previous admissions that he "told the captain [he] was going to whoop his ass." (Ex. 2, Green Dep. at ex. 21, Call No. 24723592 at 2:35); (*Id.* at Call No. 24631874 at 17:40, 25:32) (admitting that he "threatened him" stating "man I'll whoop your fat motherfucking ass too . . . I'll beat your fat motherfucking ass"); (*Id.* at Call No. 24735721, at 12:40) (admitting same).

84. Plaintiff has on multiple occasions demonstrated his willingness to lie for perceived financial gain:

      i.    *Compare* (Ex. 2, Green Dep., 28:15-29:10) (testifying that mental health therapist Misty Hoffman came to his segregation cell after the incident and told him he was taken into a "blind spot" for his beating) *with* (Ex. 2, Green Dep. at ex. 21, Call No. 24648111, at 11:41) (testifying under oath at his disciplinary hearing that it was an inmate who told him there wasn't a camera over by the doors where they beat him) *and* (Ex. 12, Hoffman Dep., 9:8, 10:24;11:2) (Hoffman testifying that she did not speak with Plaintiff on the day in question and does not know whether the incident occurred in a "blind spot").

ii.   *Compare* (Ex. 2, Green Dep. at ex. 21, Call No. 24648111 at 11:30) (testifying under oath at his disciplinary hearing that he simply "fell" down by the west gym doors), *and* (*Id*. at Call No. 24735721 at 13:00) (stating he ended up "falling" because he was dizzy), *with* (Ex. 2, Green Dep., 81:7-12) (testifying that he did not fall but was thrown down, and that he never claimed to have fallen).

iii.   (Ex. 2, Green Dep. at ex. 21, Call No. 24736752 at 32:12-45:50) (Plaintiff stating "tell Shena we going to be rich" "They going to call this 'Dredorado' when I'm done" "I'm talking big money . . . they're going to have a statue of me outside of this prison."); (*Id*. Call No. 24959106 at 12:17, 42:36) (stating "My story going to get us rich." "If everything goes right I'm taking everyone to Cancun."); (*Id*., Call No. 24968067 at 35:00 "Anything to make more money we need to do.").

## QUESTIONS PRESENTED

**A.  Whether Lt. Mansfield is entitled to qualified immunity because he did not personally participate in any alleged use of force?**

**B.  Whether Officers Johnson and Rueda are entitled to qualified immunity because:**

**1.  Plaintiff's claims regarding his head hitting doors during his escort constitute at most a de minimis use of force that did not violate his clearly established rights;**

**2.  The evidence is overwhelming that excessive force was not used when Officers Rueda and Johnson took Plaintiff to the ground outside the west gym doors; and**

**3.  Plaintiff's claims regarding his leg restraints being twisted in the strip cell constitute only a de minimis use of force that did not violate his clearly established rights?**

## QUALIFIED IMMUNITY STANDARD OF REVIEW

When a defendant asserts a qualified immunity defense on summary judgment, the burden shifts to the plaintiff to show that (1) defendant violated a constitutional right and (2) that constitutional right was clearly established. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). This is a "heavy two-part burden." *Casey v. W. Las Vegas Indep. Sch. Dist.,* 473 F.3d 1323, 1327 (10th Cir. 2007). Plaintiff "must do more than identify in the abstract a clearly established right and allege that the defendant has violated it;" he "must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity." *Green v. Post,* 574 F.3d 1294, 1300 (10th Cir.2009). The Court has discretion to decide which of the two prongs of the qualified immunity analysis to address first. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

"Ordinarily, in order for a plaintiff to demonstrate that a law is clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Tonkovich v. Kansas Bd. Of Regents*, 159 F.3d 504, 516 (10th Cir. 1998) (internal quotations omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 194-95 (2001). Rights are not to be construed broadly, but must be particularized so that the contours of the rights are clear to reasonable officials. *Reichle v. Howards*, 132 S.Ct. 2088, 2094 (2012); *Stewart v. Beach*, 701 F.3d. 1322, 1330 (10th Cir. 2012).

Generally, "facts must be viewed in the light most favorable to the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007). But that is the case "only if there is a 'genuine'

dispute as to those facts." *Id*. "[A] plaintiff's version of the facts must find support in the record: more specifically, as with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Thomson*, 584 F.3d at 1312 (quotations and citations omitted). "Hence, the principal purpose of assessing whether plaintiff's evidence gives rise to genuine issues of material fact in the qualified-immunity context is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court." *Tellez v. City of Belen*, No. 13-2123, slip op. at 4 (10th Cir. May 20, 2014) (unpublished).

## ARGUMENT AND AUTHORITIES

In the sections below, Defendants first demonstrate that Lt. Mansfield is entitled to qualified immunity because he did not personally participate in any of the alleged constitutional violations. It is then argued, on the multiple claims against Officers Rueda and Johnson, that, when viewed as a whole, including Plaintiff's documented perjury and the fact that he suffered no more than *de minimis* injuries, the record in this case entitles the officers to qualified immunity.

### A. *Lt. Mansfield is entitled to qualified immunity because he did not personally participate in any alleged constitutional violation.*

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foot v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) (citation omitted). A plaintiff must establish that each defendant, through the official's own individual actions, violated the Constitution. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 768 (10th Cir. 2013) (*citing Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

Simply the right to control employees is not enough to establish supervisory liability, the plaintiff must establish a deliberate, intentional act by the supervisor to violate his constitutional right. *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1153 (10th Cir. 2006). Nor is a supervisor "liable for an isolated failure of his subordinates to carry out prison policies . . . unless the subordinates are acting (or failing to act) on the warden's instructions." *Rassel v. Werholtz*, No. 07-3290, 2009 WL 302078, * 4 (D.Kan. Feb. 6, 2009) (quoting *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998)).

Other than their conversation in which Plaintiff threatened him with violence, Lt. Mansfield had no interaction with the Plaintiff on July 21, 2010. (Ex. 6, Mansfield Dep., 108:9). Plaintiff originally concocted an elaborate conspiracy theory in an effort to implicate Lt. Mansfield in the alleged excessive use of force by defendants Johnson and Rueda. Specifically, Plaintiff alleged that, because of his interaction with Officer McKeen – with whom Plaintiff speculated Lt. Mansfield was having an affair – Lt. Mansfield ordered officers Johnson and Rueda to beat him via a coded message: "turn Green around." (Doc. 1, Compl. at 3-4).

During discovery, Plaintiff learned that it was in fact Lt. Randy Sherman who ordered Officers Johnson and Reuda to return Plaintiff to the captain's office, because of confusion as to whether paperwork necessary to place an inmate into segregation had been completed. (Ex. 8, Sherman Dep., 13:14-14:8); (Ex. 4, Reuda Dep., 28:15).[5] Incredibly, Plaintiff has since

---

[5] KDOC Internal Management Policy and Procedure ("IMPP") Nos. 20-103 and 20-105 require that a form entitled "Checklist Of Possible Self-Harm Indicators" be completed for all inmates placed in segregation. KDOC IMPP 20-103, *available at* https://www.doc.ks.gov/kdoc-policies/AdultIMPP/chapter-20/20103.pdf; KDOC IMPP 20-105, *available at* http://www.doc.ks.gov/kdoc-policies/AdultIMPP/chapter-20/20105.pdf. Per these policies, this form is to be completed in addition to the clearance an inmate must receive from contracted medical staff in order to place an inmate into segregation.

maintained his allegations against Lt. Mansfield, albeit modifying to state that "Lt. Mansfield's office" ordered Plaintiff returned to the office. (Doc. 85, Pretrial Order at 4).

Lt. Mansfield has testified that he did not see the Plaintiff again after he was escorted from his office on July 21, 2010. (Ex. 4, Mansfield Dep., 108:9, 126:14) ("I was not at the location where [Plaintiff was put on the ground.]" "I gave them the directive to leave my office with Mr. Green and proceed to a segregation unit which would have been on the west side of the compound. That is the direction that they were going the last I knew." ). Additionally, he did not give any order to bring Plaintiff back to the office. (*Id.* at 171:6, 176:10) (testifying that his business with Plaintiff was done and that he was told after the fact that Sherman had ordered to bring Green back to be cleared for segregation). Nor does Plaintiff have any personal knowledge that Lt. Mansfield ordered him to be turned around. (Ex. 5, Green Dep. at 58:15-59:14) (testifying that he heard Officer Rueda say the captain's office called and told them to "turn him around," however he did not hear the order and knows not from whom it came).

Lt. Mansfield did not personally participate in any use of force and did not otherwise order any other officers to use excessive force against Plaintiff. Plaintiff's allegations regarding a coded message – not even issued by Lt. Mansfield – to 'turn Green around' is based not on personal knowledge but obsessive speculation. *See* (Ex. 5, Green Dep., 83:1-25) (testifying that he had never been "turned around" before and has no knowledge of anyone else being turned around). In sum, because there is no genuine dispute that Lt. Mansfield did not personally participate in any conduct that could constitute a constitutional violation he is entitled to qualified immunity.

**B.   Officers Johnson and Rueda are entitled to qualified immunity on Plaintiff's alleged uses of force.**

The unnecessary and wanton infliction of pain can constitute cruel and unusual punishment forbidden by the Eighth Amendment. *Hudson v. McMillian,* 503 U.S. 1, 5 (1992). To succeed on an excessive use of force claim, plaintiff must show (1) that the alleged wrongdoing was objectively harmful enough to establish a constitutional violation; and (2) that defendants acted with a sufficiently culpable state of mind. *Norton v. The City Of Marietta, OK*, 432 F.3d 1145, 1154 (10th Cir. 2005). The core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).

The extent of an inmate's injury is one factor in this analysis, as it may indicate the amount of force applied and "whether the use of force could plausibly have been thought necessary in a particular situation." *Id.* "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7.

Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Id*. at 9. *De minimis* uses of physical force are excluded from the cruel and unusual punishment inquiry unless "repugnant to the conscience of mankind." *Wilkins,* 559 U.S. at 38; *see e.g. Smith v. Cochran*, 339 F.3d 1205 (10th Cir. 2003) (holding sexual abuse sufficiently repugnant). Although an inmate need not show a "significant injury" to state a claim, he must show more than a *de minimis* use of force. *Wilkins,* 559 U.S. at 38

In the pretrial order, Plaintiff alleged three separate uses of force by Officers Johnson and Rueda on July 21, 2010: (1) hitting Plaintiff's head on the door leading out of the captain's office and the west gym doors leading outside; (2), being thrown to the ground, punched, kicked, and tased outside the west gym doors; and (3), stepping on his leg restraints in the strip-out room once he was escorted to the cell house. (Doc. 85 at 3-4). These are addressed in turn below.

### 1. Plaintiff's claims that his head hit doors during his escort constitute a de minimis use of force that did not violate his clearly established rights.

Defendants should first note that despite Plaintiff's testimony to the contrary, (Ex. 5, Green Dep., 20:2), video of the incident clearly shows that Plaintiff's head did not strike the door leading out of the captain's office. (Ex. 1, Rueda Dep., at ex 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:54:25-30). The door in question swings inward into the office and was already behind Officer Rueda standing to Plaintiff's right when Plaintiff exits without trouble. (*Id.*).

Unfortunately, the angles of the cameras do not clearly capture Plaintiff going through the second set of double doors, referred to as the west gym doors, where Plaintiff also claims his head was hit. These doors are free swinging – i.e. they do not have a latch – and Officer Rueda testified that he opened the doors with his forearm, does not remember Plaintiff's head hitting the doors, and certainly did not use Plaintiff's head as a battering ram to open the doors as alleged in the Complaint. (Ex. 4, Rueda Dep., 35:10, 68:25-69:20). This is consistent with Rueda's statement given in response to KDOC's internal investigation in this matter, as well as Officer Johnson's. (Rueda Dep. Ex. 5); (Johnson Dep. Ex. 4, at AG9, AG11). The Officers' version of events is also consistent with the security video, which shows Officer Johnson to be the last person through the doorway, from which one can infer that Officer Rueda indeed led the way because Plaintiff was necessarily between them given the alternative escorting procedure. (Ex. 4,

Rueda Dep., at ex. 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:54:25-36).

In any event, even assuming the facts in the light most favorable to Plaintiff, it is clear that, at most, a *de minimis* amount of force occurred while Officers Johnson and Rueda attempted to maintain control of the non-compliant and threatening Plaintiff while escorting him to segregation. This does not constitute a violation of Plaintiff's clearly established constitutional rights. *Rhoten v. Werholtz*, 243 F. App'x. 364 (10th Cir. 2007) (unpublished) (affirming dismissal where plaintiff alleged that he was slammed against a wall, and his nipples and genitals were squeezed "real hard causing a great deal of discomfort and pain" as a *de minimis* use of force insufficient to state claim for relief); *Hughes v. Sedgwick County Sheriff*, 08-3006-SAC, 2011 WL 112050 (D. Kan. Jan. 13, 2011) (dismissing excessive force claim as *de minimis* where plaintiff alleged that defendant "rammed his head against a wall because plaintiff called him a racist"); *Bafford v. Nelson*, 241 F. Supp. 2d 1192, 1202 (D. Kan. 2002) (holding no violation where, in response to inmate's threat of violence and aggressive movement, officer forced inmate to the ground, punched him in the face, and grabbed his nostrils).

Clearly, Plaintiff created a disturbance in the office by threatening violence against Lt. Mansfield. *See* (Green Dep. Ex. 3, Disciplinary Report 10-07-133) (stating that Plaintiff told Lt. Mansfield he "will get down with you fat motherfucker"). Additionally, Plaintiff disobeyed direct orders to "face forward" and exit the office when he attempted to turn. (Ex. 4, Rueda Dep., at ex. 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:54:27); (Ex. 1, Rueda Dep., 34:9) (stating once Plaintiff started to turn he was placed in the alternate escorting procedure); (Green Dep. Ex. 4, Disciplinary Report 10-07-134) (stating Plaintiff began to turn his body after being ordered by Officer Johnson to face forward).

Furthermore, Plaintiff was being combative and resisted walking as he left the office. (Ex. 1, Rueda Dep., 40:19-41:8, 70:16-71:6); (Ex. 5, Green Dep. at ex. 21, Call No. 24648111 at 11:30 (Plaintiff testifying under oath at his disciplinary hearing that he could not walk due to being bent forward); (Ex. 5, Green Dep. at ex. 1, Pl.'s Undated Ltr., at AG 567) (stating his belt "popped" and his pants were falling down at the time). Lastly, Plaintiff suffered no injury from this incident, *see infra* at Part B.2.b, providing strong evidence that the force used was minor.

In sum, even assuming Plaintiff's head did hit the west gym doors, this was no more than a *de minimis* amount of force which occurred while Officers Johnson and Rueda attempted to maintain control of the threatening and combative Plaintiff. Additionally, because this amount of force is not so far disproportionate to the perceived threat that it would have been clear to a reasonable officer that the conduct was unlawful, Officers Johnson and Rueda are entitled to qualified immunity.

### 2. Because no reasonable person would believe that excessive force was used on Plaintiff outside the west gym doors, Officers Johnson and Rueda are entitled to qualified immunity.

Officers Johnson and Rueda are also entitled to qualified immunity regarding Plaintiff's claims that he was thrown down outside of the west gym doors, repeatedly beaten and kicked, and eventually tased. Although such allegations are incredibly serious, the overwhelming evidence in this case proves that Plaintiff has in fact perjured himself and no excessive force was used. Officers Johnson and Rueda are also entitled to qualified immunity because the evidence taken as a whole indicates the amount of force actually used to subdue the combative and threatening Plaintiff was not so far disproportionate to the perceived threat that it would have been clear to a reasonable officer that the conduct was unlawful.

Admittedly, this case hinges on a factual dispute, as Defendants expressly deny Plaintiff's allegations that he was repeatedly hit, kicked, and even tased when he was on the ground outside of the west gym doors. Indeed, it seems Plaintiff has little personal knowledge of his allegations, as he does not recall who tased him (Ex. 2, Green Dep., 31:17), nor who kicked or hit him (Doc. 33:12-14). Nevertheless Officers Johnson and Rueda are entitled to qualified immunity on summary judgment because there is no *genuine* dispute in this case: Plaintiff was not beaten, kicked or tased.

"[I]n the face of the defendant's properly supported motion for summary judgment, the plaintiff could not rest on his allegations of a conspiracy to get to a jury without 'any significant probative evidence tending to support the complaint.'"*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, (1986); *Tellez v. City of Belen*, 13-2123, 2014 WL 2061677 (10th Cir. May 20, 2014) (unpublished) (affirming summary judgment on qualified immunity grounds where district court correctly excluded material portions of the affidavits of Plaintiff's witnesses that were so inconsistent with the other evidence in the record that no reasonable juror could have possibly relied on them to return a verdict in Plaintiff's favor). "[T]estimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it." *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997) (affirming summary judgment and holding self-serving affidavit contradicting previous admissions was insufficient to create a "genuine" factual dispute).

"The removal of a factual question from the jury is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury." *Johnson v.*

*Washington Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989) abrogated *on other grounds by Belton v. Washington Metropolitan Area Transit Authority*, 20 F.3d 1197, 1200 (D.C.Cir.1994). In this case, Plaintiff's unsupported and self-serving testimony is undermined by everything in the above quote: (a), the evidence is overwhelming that Plaintiff has perjured himself; and (b), numerous medical reports and photographs taken at the time indicate Plaintiff did not suffer any significant injuries, let alone injuries consistent with the type of beating alleged; and (c) the overwhelming evidence demonstrates that excessive force was not used in this case such that it would put a reasonable prison official on notice that his conduct is illegal.

### a.   The evidence is overwhelming that Plaintiff has perjured himself.

Plaintiff testified that he was tased by either Officer Johnson or Rueda after he was thrown to the ground outside the west gym doors. (Ex. 2, Green Dep., 30:2-32:1). Plaintiff further testified that thereafter, he was bleeding from the spot on his lower back where he claims he was tased. (*Id*. at 53:10, 40:11) (testifying that his back was "scarred from the tasing" immediately after the incident when he was being evaluated by medical staff on July 21, 2010). This is physically impossible because:

     i.    The only electronic stun devices used within the facility at that time did not contain projectile dart cartridges and did not break one's skin or cause bleeding upon application. (Ex. 16, McGuire Aff., ¶¶4-5).

     ii.    The Stinger electronic stun devices record each date and time they are fired, and the printouts from the units indicate no gun was fired on July 21, 2010. (Ex. 17, McGuire Dep., 18:23); (Ex 17, McGuire Dep. exs. 1-9, Stinger Reports).

iii.    In July of 2010, only officers with the rank of COII were permitted to carry the Stingers within EDCF, (Ex. 16, McGuire Aff., ¶6), and both Officers Johnson and Rueda were COI rank at the time. (Ex. 4, Rueda Dep., 9:22); (Ex. 5, Johnson Dep., 9:23).

iv.    Officer Johnson and Rueda both testified that they were not even carrying an electronic stun device on July 21, 2010. (Ex. 5, Johnson Dep., 84:21, 95:22) (testifying he never deployed an electronic stun device during his employment at EDCF); (Ex. 9, Rueda Aff., ¶3).

Lastly, Plaintiff did not initially report any alleged use of an electronic stun device during his multiple examinations by medical and mental health workers immediately after the incident and later on July 23, 2010. (Ex. 13, Smith Aff., at AG 458-463). During Plaintiff's disciplinary hearing on July 23, 2010, he testified under oath about the incident and never claims to have been tased. *Compare* (Ex. 2, Green Dep. at ex. 21, Call No. 24648111) *with* (Ex. 2, Green Dep., 86:4) (testifying at his deposition that "[he] brought up that they tased [him]" during his disciplinary hearing). In fact,  it was not until July 26, 2010 – five days after the incident – that Plaintiff finally complained to medical staff that he had taser marks on his back. (Ex. 13, Smith Aff., at AG 456). Yet after examination, Plaintiff was found to have no bruising or marks on his back or abdomen. (*Id.*); (Ex. 18, Bahm Email Statement, marked as AG 28).

Plaintiff also perjured himself regarding his threat against Lt. Mansfield. At his deposition, Plaintiff testified that his threat against Lt. Mansfield - "I'll get down with you, you fat motherfucker" – was, in fact, not a threat and that he only meant he wanted to "argue" with the Lieutenant. (Ex. 2, Green Dep, 22:14-23:10). This facially implausible testimony is directly contradicted by Plaintiff's prior admissions that he "told the captain [he] was going to whoop his

ass." (Green Dep. Ex. 21, Call No. 24723592 at 2:35); (*Id.* at Call No. 24631874 at 17:40, 25:32) (admitting that he "threatened him" stating "man I'll whoop your fat motherfucking ass too . . . I'll beat your fat motherfucking ass"); (*Id.* at Call No. 24735721, at 12:40) (admitting same).

In sum, Plaintiff has on multiple occasions demonstrated a willingness to lie for perceived financial gain:

- *Compare* (Ex. 2, Green Dep., 28:15-29:10) (testifying that mental health therapist Misty Hoffman came to his segregation cell after the incident and told him he was taken into a "blind spot" for the alleged excessive use of force) *with* (Green Dep. Ex. 21, Call No. 24648111, at 11:41) (testifying under oath at his disciplinary hearing on July 23, 2010 that it was an inmate told him there wasn't a camera over by the west gym doors) *and* (Ex. 12, Hoffman Dep., 9:8, 10:24;11:2) (Ms. Hoffman testifying that she did not speak with Plaintiff on the day in question and does not know whether the incident occurred in a "blind spot.").

- *Compare* (Ex. 2, Green Dep. at ex. 21, Call No. 24648111 at 11:30) (testifying under oath at his disciplinary hearing that he simply "fell" down by the west gym doors), *and* (*Id.* at Call No. 24735721 at 13:00) (stating he ended up "falling" because he was dizzy), *with* (Ex. 2, Green Dep., 81:7-12) (testifying that he did not fall but was thrown down, and that he never claimed to have fallen).

- (Ex. 2, Green Dep. at ex. 21, Call No. 24736752 at 32:12-45:50) (stating "tell Shena we going to be rich" "They going to call this 'Dredorado' when I'm done" "I'm talking big money . . . they're going to have a statue of me outside of this prison."); (*Id.* Call No. 24959106 at 12:17, 42:36 ) (stating "My story going to get

us rich." "If everything goes right I'm taking everyone to Cancun."); (*Id.*, Call

No. 24968067 at 35:00 "Anything to make more money we need to do.").

### b. Medical records and photographs taken around the time of incident are wholly inconsistent with Plaintiff's allegations that he was repeatedly beaten, kicked, and tased, and demonstrate that Plaintiff suffered only a one-inch abrasion under his chin and a one-centimeter abrasion on his right ankle.

Numerous independent[6] medical and mental health examinations spanning from immediately after the incident to many months later consistently found that Plaintiff suffered nothing but *de minimis* injuries as a result of his July 21, 2010 incident. These credible reports are wholly inconsistent with Plaintiff's allegations of being savagely beaten, kicked and tased.

On July 21, 2010, Plaintiff was assessed by medical staff immediately after the incident who found "no visible injuries" and "no visible head trauma." (Ex. 13, Smith Aff. at AG 462). Although Plaintiff complained that his ankle was "broken," medical records note he walked into the clinic without a limp. (*Id.*).

After submitting a request for sick call, Plaintiff was assessed again by medical staff on July 23, 2010. Although he complained that his right ankle and both wrists were broken, medical staff again found no evidence of injury besides a "small abrasion on [Plaintiff's] chin." (*Id.* at AG 459-60) Plaintiff was prescribed ibuprofen for his pain. (*Id.* at AG 459-60).

Three days later on July 26, 2010, Plaintiff was again examined by medical staff after complaining that his abdomen hurt, his ankles were swollen, he had taser marks on his back, and his knees were "popping." (*Id.* at AG 456). Medical staff again found "no visible trauma" and noted only the one inch abrasion under Plaintiff's chin and a one-centimeter abrasion on his right ankle that were "healing well." (*Id.*); *see also* (Ex. 15, DVD marked as AG 114, image "MVC-897S.jpg") (showing chin abrasion as of July 26, 2010); (*Id.*, image "MVC-889S.jpg") (showing

---

[6] The KDOC contracts with the private company Corizon, and formerly Correct Care Solutions, to provide medical and mental health services for its inmates. (Ex. 12, Hoffman Dep., 7:13); (Ex. 13, Smith Aff., ¶2).

abrasion on right ankle). No other bruising or marks on his back, abdomen, or hands were found. (Ex. 13, Smith Aff., at AG 456).

On July 28, 2010, emergency orders were entered after Plaintiff complained of acute chest pains. (*Id*.). At his deposition, Plaintiff testified that although he thought he was suffering from a medical emergency, after medical staff put him on a liquid diet he "realized" that he was not hurt quite that bad. (Ex. 2, Green Dep., 102:21-105:11). Thus, Plaintiff reported he was "doing fine" the following day. (Ex. 13, Smith Aff. at AG 449).

Although they were not medically indicated, (*Id*. at AG 436), x-rays performed on his chest and spine were within normal limits. (*Id*. at AG 432). Perhaps the best summation of Plaintiff's amorphous and varying complaints was explained on his September 1, 2010 exam:

> Inmate is a 22 y.o. Afro-American male who comes to Sick Call today with complaints of neck, back, and rib pain. He was involved in an altercation with SST officers of 7/21/2010…He tells me that the pain is so bad he is having trouble sleeping at night. He is on Tylenol and ibuprofen, but he tells me it doesn't help. He tells me that all of the above have been hurting since the altercation on 7/21/2010. In addition, he tells me his hips, knees, and ankles "pop." He tells me his hands and feet are numb, but can't really explain how long that has been bothering him. He tells me he has a lump over his left ear, which is tender. He does not tell me whether or not he was hit in the head, in fact, he is rather vague about the nature of all his injuries.
>
> Inmate is athletic-appearing and thin. [Nothing abnormal is detected] His affect seems calm for the level of pain he says he's in. His gait is normal despite being shackled at the wrists and ankles. He is highly suggestible in that he doesn't tell me his hands and feet are numb until I ask him…I see no bumps of ecchymosis of the scalp…Neck is supple with good [range of motion]. He has good strength with rotation of the head against resistance, although he gives a poor effort…Knees show no edema or erythema…Ankles show no edema…
>
> X-rays of the chest, lumbar, and cervical spines are obtained. These are [within normal limits]. Inmate can continue on ibuprofen and Tylenol for now. I don't have anything else to offer him for pain; Lortab certainly is not indicated for his pain. Due to inmate's suggestible nature, and due to the fact that he is a poor historian, it is difficult to assess the true nature of his injuries…His injuries do not appear to be severe at all. I think over time his pain will slowly resolve.

(*Id.* at AG 432); *see also* (Ex. 2, Green Dep., 120:4-122:3) (testifying that he had a swollen "bump" on his head after the incident, that was "basically a scar" as well as an "open wound" that one could not see because "it had hair growing over it"). Plaintiff's mental health evaluations concur that he did not suffer the alleged punches, kicks, and tasing on July 21, 2010:

> Plaintiff's self-reported . . . symptoms of PTSD and depression appear exaggerated relative to his clinical presentation and are consistent with immature attempts to manipulate others for secondary gain. Official documentation of the incident occurring 07-21-10 at Eldorado Correctional Facility does not support the level of trauma or severity reported by Mr. Green. It should be noted that, in the current evaluation, Mr. Green inquired as to how to apply for SSDI based on his PTSD diagnosis. Despite reporting a relatively high level of depression, no observable signs of same were evidenced in the current evaluation. Similarly, medical records and institutional files do not document any observable signs of distress other than that which has been reported by Mr. Green. It is the opinion of the examiner that Mr. Green, given his history and current clinical presentation, is providing unreliable self-report information as to his mental status.

(*Id.* at AG 259). In sum, Plaintiff's medical records demonstrate that he suffered only a one-inch and a one-centimeter abrasion on his chin and ankle, respectively. These *de minimis* injuries strongly support the fact that no excessive force was used in this case.

Photos taken of Plaintiff from immediately after the incident to July 26, 2010, also demonstrate Plaintiff did not suffer injuries consistent with being brutally beaten, kicked, and tased. KDOC policy requires that photos be taken of an inmate immediately after a use of force and once every twelve hours for the next 48 hours. (Ex. 8, Sherman Dep., 30:21-32:23). These photos are printed in black and white and collected with accompanying narrative reports by the captain's office into a "packet." (*Id.* at 30:17); (Ex. 1, Use of Force Report No. 11-008). The originals color digital files of these photos were also collected by KDOC's Enforcement, Apprehension, and Investigations Officer O'Brien as a part of the internal investigation file. (Ex.

14, DVD, marked as AG 115). [7] Additionally, Officer O'Brien took another 38 digital color photos of Plaintiff during his July 26, 2010, medical examination as a part of his investigation. (Ex. 15, DVD, marked as AG 114). [8]

### c. The record in this case demonstrates that the force used was not so excessive given the threat Plaintiff presented that a reasonable prison official would know their conduct would violate his clearly established rights.

After Plaintiff created the need for use of force by threatening violence, disobeying orders to "face forward" and exit the office, and while he was physically resisting walking during the escort, *see supra* Part B.1, Plaintiff exited the west gym doors heading in the direction of the segregation cell houses. (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1254_#12.avi" at time stamp 12:54:35); (Ex. 6, Mansfield Dep., 126:14) (testifying they were headed in the direction of the segregation units);

Meanwhile in the captain's office, Lt. Randy Sherman ordered Corrections Officer Tamara Samuels to go catch Officers Johnson and Rueda tell them to return Plaintiff to the office. (Ex. 7, Samuels Dep. at ex. 2); (Ex. 4, Reuda Dep., 28:15). Lt. Sherman so ordered them to return after they had been dismissed because he was confused as to whether a checklist necessary to place an inmate in segregation had been completed. (Ex. 8, Sherman Dep., 13:14-14:8).

Surveillance videos show that Officer Samuels exited the captain's office approximately twenty seconds after the escort party, and proceeded to stand in the west gym doorway. (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:54:49-53) (*Id.* at file "20100721_1254_#12.avi") (showing she does not emerge from

---

[7] For summary judgment and the sake of clarity, the parties have stipulated to the admissibility of both the printed black and white photos, as part of the Use of Force Report No. 11-008, and the original digital images, as a part of the EAI Investigation File for Case No. SM-10-0257-07. (Doc. 85 at 3). Copies of the digital images will be filed conventionally on dvd format.

[8] Again, stipulated to admissibility. (Doc. 85 at 3).

the doorway)[9]. Officer David Conner and Lt. Sherman followed Officer Samuels out of the office and to the same location after approximately twelve and fifteen seconds, respectively (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:55:02-12:55:08).

Moments after exiting the west gym doors, Officers Johnson and Rueda turned around in response to Lt. Sherman's order, and came back to the doors whence they had just emerged. (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1254_#12.avi" at time stamp 12:54:06 to 12:54:29) (showing Plaintiff returning to the doors after approximately fourteen seconds).

Upon reaching the west gym doors, Plaintiff attempted, or was perceived by Officers Rueda, Johnson, and Samuels to attempt to kick his left foot out at Johnson. (Ex. 4, Rueda Dep., 40:12); (Ex. 1, Use of Force Report No. 11-008 at 2, 5); (Ex. 5, Johnson Dep., 27:19-28:2, 36:8) (testifying he perceived Plaintiff to be a threat at the time because he was "flailing" and "flopping" around, cussing, throwing his head, and trying to kick him); (Ex. 7, Samuels Dep. at ex. 2, stating she was holding the door when Plaintiff "decided not to walk and it appeared he was kicking backwards towards the officers"). In response, Officer Rueda forced Plaintiff to the ground, and gained control of Plaintiff's legs while Johnson took control of his upper body. (Ex. 4, Rueda Dep., 76:12-77:7) (testifying that while he maintained the alternative escorting procedure with his left arm, he came across Plaintiff's back with his right arm and forced him to the ground). No punches, kicks, or stun devices were deployed by Officers Johnson and Rueda. (Ex. 4, Rueda Dep., 36:1, 73:13); (Ex. 5, Johnson Dep., 40:14-16); (Ex. 7, Samuels Dep. at ex. 2) (describing that while Plaintiff was on the ground, Officer Rueda merely crossed Plaintiff's legs behind his back while Officer Johnson held his head by placing his knee on his shoulder).

---

[9] It should be noted that the time stamps for the two cameras angles appear to be off by about thirty seconds.

Approximately thirty seconds after the escort party returned to the west gym doors and Plaintiff was put on the ground, Officer Troy Carrell responded from the west. (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1254_#12.avi" at time stamp 12:54:30). Although initially jogging to where he heard yelling and cursing, Officer Carrell slowed to a walk as he approached because at that point "he could see that Plaintiff still had his restraints on and no struggle or fight was occurring." (Ex. 10, Carrell Narrative Report at 1-2, marked as AG 21-22) (stating that Plaintiff was lying on his chest with Officers Johnson and Rueda at his side maintaining control of him).

From indoors, Officer David Conner and Lt. Sherman arrived at the location approximately fifteen and twenty seconds after Plaintiff re-arrived at the west gym doors, respectively. (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:55:06, 12:55:11) (accounting for the fourteen seconds it took the escort party to travel west and return to the doors). Both observed no punching, kicking, tasing, or other abuse of the Plaintiff. (Ex. 8, Sherman Dep. at ex 2); (Ex. 11, Conner Email Statement, marked as AG 19).

After the other officers arrived, Plaintiff was then turned onto his side while it was decided to take him back to the clinic to get him checked out after the use of force. (Ex. 10 Carrell Narrative Report, marked as AG 22). Plaintiff is seen reentering the west gym doors approximately two minutes after his initial passage, (Ex. 4, Rueda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1248_#4 2.avi" at time stamp 12:56:31), and Plaintiff is immediately photographed by KDOC staff immediately after he is examined in the clinic. (*Id.* at file "20100721_1300_#4.avi" at time stamp 13:01:11).

In sum, Defendants maintain that the Court should not adopt Plaintiff's self-serving claims that he was beaten, kicked, and tased, because they are not "sufficiently grounded in the record," in light of: (a), Plaintiff's demonstrated perjury in this case; (b), the numerous credible medical examinations by multiple independent medical staff members that demonstrate Plaintiff suffered *de minimis* injuries inconsistent with his testimony; and (c), the testimony from Officers Johnson and Rueda, along with numerous reports from witnesses demonstrating no more force than necessary was used. *See Tellez*, No. 13-2123, slip op. at 4. (quoting *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring) ("The principal purpose of assessing whether plaintiff's evidence gives rise to genuine issues of material fact in the qualified-immunity context is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court")

Thus, the two legal questions before the Court are whether Plaintiff's allegations are sufficiently grounded in the record to satisfied his heavy burden of demonstrating that a constitutional violation occurred, and that Officers Johnson's and Rueda's actions were so far disproportionate to the threat presented by the Plaintiff that it would have been clear to a reasonable prison official that this conduct violated Plaintiff's clearly established rights. The answer to both questions is no.

Plaintiff's threats of violence and resistance alone would justify the minimal amount of force used by Johnson and Rueda to bring Plaintiff to the ground in order to maintain control of the situation. *See Fennell v. Williams*, 1:09-CV-02429-RBH, 2011 WL 251454 (D.S.C. Jan. 25, 2011) (plaintiff's admitted failure to follow direct orders and resistance to being relocated

created a reasonable perception that he posed a threat sufficient to justify using force including overly tight handcuffs, stunning with taser, and holding inmate down).

Additionally, reviewing circuit case law on point demonstrates that the force used in this case was not so clearly disproportionate to the threat presented by the agitated and threatening Plaintiff that it would have been clear to a reasonable officer that his actions were unlawful. *Compare Cruz v. Webb*, 211 F.3d 1277 (10th Cir. 2000) (unpublished) (no violation where officers took inmate to the ground then slammed him against wall in order to restore discipline after inmate flushed contraband down a toilet and disregarded orders to get against a wall); *and Bafford v. Nelson*, 241 F. Supp. 2d 1192, 1201 (D. Kan. 2002) (no violation where, in response to inmate's threat of violence and aggressive movement, officer forced inmate to the ground, punched him in the face, and grabbed his nostrils); *with Green v. Branson*, 108 F.3d 1296 (10th Cir. 1997) (reversing summary judgment where, viewing facts in light most favorable to the plaintiff, prison officers beat the plaintiff without any provocation).

Another instructive case on this claim is that of *Avery v. Anderson*, 94 F. App'x 735, 739 (10th Cir. 2004). In *Avery*, the inmate-plaintiff was subjected to a clothing change and regularly scheduled search. (*Avery v. Anderson*, No. 2:01-CV-763 TC, at 2 (D. Ut. Aug. 21, 2003))[10]. Prison policy dictated that Avery and his cellmate be handcuffed during the search, and this was achieved by the inmates backing up to a "cuffport" where they hold their hands out while officer apply restraints. *Id*. While Avery was being handcuffed, the defendant-officer fastened the left hand "very roughly[,]" causing Avery to pull his un-cuffed hand back into his cell and state that he would not comply with the procedure and the defendant's orders to return his hand. *Id* at 2-3. The defendant, still in control of Avery's cuffed hand, "pulled and thrashed Plaintiff's arm and

---

[10] The 10th Circuit decision references the facts as stated in the district court's Order, which is attached in accordance with D. Kan. Rule 7.6(c).

hand using the cuff as a handle, then twisted and pinned Plaintiff's arm and hand high upon the door . . . causing much pain and injury." (*Id.* at 3) (internal quotation omitted). It was undisputed that the officers ordered Avery to place his free hand out of the cell so they could finish cuffing him, and that he disobeyed their orders stating that the cuffs were too tight. *Id.* at 9. However, due to the position that defendant had placed the arm over which he had control, Avery was actually unable to comply with the orders to place his unrestrained hand back through the cuffport, though the defendant was unaware of this fact at the time. (*Id.*). The defendant averred that he believed Avery was attempting to pull his cuffed hand into the cell, and that he was fearful that Avery could use the open end of the cuffs as a weapon on his cellmate or other guards if he did not maintain his hold of the open cuffs. *Avery v. Anderson*, 94 F. App'x at 739.

In granting qualified immunity, the district court held that "the amount of force described by [Avery], even if objectively unreasonable under the circumstances, was not so far disproportionate to the perceived threat that it would have been 'clear to a reasonable officer that the conduct was unlawful in the situation he confronted.'" (*Avery v. Anderson*, No. 2:01-CV-763 TC, at 10). In affirming the decision on appeal, the Tenth Circuit held that the undisputed fact Avery admitted he violated the procedures and officer's orders by pulling his free hand back inside the cell, along with the officer's reasonable belief that the cuffs could be used as a weapon – even though Avery had made no such threats – were "sufficient to support entitlement to qualified immunity." *Avery v. Anderson*, 94 F. App'x at 739.

Again, Plaintiff created the need for use of force by threatening violence, disobeying orders to "face forward" and exit the office, and by physically resisting walking during the escort. *see supra* Part B.1. Even assuming Plaintiff was merely unable instead of unwilling to stop resisting because of either the alternate escorting procedure employed or the fact that it was

difficult for him to walk because his belt had broken and his pants were coming down, *see supra* SOF No. 19, these facts do not undermine Officers Johnson's and Rueda's reasonable beliefs "made in haste, under pressure, and . . . without the luxury of a second chance" that the Plaintiff, who had just threatened violence and was struggling with them, may make good on his previous threats. *See Whitley v. Albers*, 475 U.S. 312, 320 (1986). It is the same case even if the Court assumes that Plaintiff's leg only unintentionally came out from under him as he was falling and that he did not intend to kick anyone. *See supra* SOF No. 84(ii). All three officers who witnessed the Plaintiff near the west gym door quite reasonably believed that the agitated and threatening Plaintiff presented a threat with his unrestrained feet. Officers Rueda, Johnson, and Samuels all perceived Plaintiff as attempting to kick his left foot at Officer Johnson. (Ex. 4, Rueda Dep., 40:12); (Ex. 1, Use of Force Report No. 11-008 at 2, 5); (Ex. 5, Johnson Dep., 27:19-28:2, 36:8) (testifying he perceived Plaintiff to be a threat at the time because he was "flailing" and "flopping" around, cussing, throwing his head, and trying to kick him); (Ex. 7, Samuels Dep. at ex. 2, stating she was holding the door when Plaintiff "decided not to walk and it appeared he was kicking backwards towards the officers").

In sum, because Officers Johnson's and Rueda's actions, as supported by the record as a whole, were not so far disproportionate to the threat presented by the Plaintiff that it would have been clear to a reasonable prison official that the conduct violated Plaintiff's clearly established rights, the Officers are entitled to qualified immunity.

### 3. *Officers Johnson and Rueda are entitled to qualified immunity on Plaintiff's claims regarding his leg restraints because nothing more than a de minimis use of force occurred that did not violate his clearly established rights.*

Lastly, Plaintiff claims that Officers Johnson and Rueda "continued to use physical force on him, including stepping down onto [his] ankle shackles" while in the strip-out room in C-Cell

House. (Doc. 85 at 4). Because Plaintiff 's *de minimis* one-centimeter abrasion on his ankle isinsufficient to support an excessive force claim regarding the leg restraints, and because the force allegedly used was not so far disproportionate to the threat presented that it would have been clear to a reasonable prison official that this conduct violated Plaintiff's clearly established rights, Officers Johnson and Rueda are entitled to qualified immunity.

At his deposition, Plaintiff speculated that it was Officer Rueda that stepped on his leg restraints. *Compare* (Ex. 2, Green Dep., 46:8-48:12) (testifying that at the time he was face-first against the wall with his nose in the corner and that he only knew it was Rueda because he was "basically" the only one in the cell) *with* (Ex. 4, Reuda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1308_#11.avi" at time stamp 13:08:44) (showing officers Johnson, Rueda, and Gates all entering the cell).

Officer Rueda did not intentionally step on Plaintiff's let restraints in the strip-cell. (Ex. 4, Rueda Dep., 74:8). The security video of the incident shows the Plaintiff entering the strip-out room, preceded by Officer David Lewis, and followed by Officers Johnson, Rueda, Casey Gates, Troy Carrell, and Joshua Cleveland, respectively. (Ex. 4, Reuda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1308_#11.avi" at time stamp 13:08:27). The camera angle does not view inside the cell, however, and loses view of Plaintiff once he enters the strip cell with Officers Johnson, Rueda and Gates. (*Id*. at time stamp 13:08:44).

In the strip cell, Plaintiff was placed with his face in the corner against the wall with Officers Rueda and Johnson maintaining control of his arms while Officer Gates removed the leg restraints. (Ex. 2, Green Dep., 46:8-48:12); (Ex. 10, Carrell Narrative Report at 2). (testifying he placed his arm across his back). Although Plaintiff was not physically resisting at this time, he continued making verbal threats and abusive statements. (Ex. 5, Johnson Dep., 95:14); (Ex. 10,

Carrel Narrative Report); (Ex. 10, Carrel Narrative); (Ex. 19, Lewis Email Statement, marked as AG 25) (quoting Plaintiff as stating "Yeah you mother fuckers are real tough when I have these cuffs on. Let's take these cuffs off and let's see how tough you are" And "You bitches better hope you don't see me on the streets").

When officers remove leg restraints with an inmate up against a wall, they have the inmate lift one leg up off the ground while the other officer places their foot or leg behind the inmate's opposite foot on the ground. (Ex. 4, Rueda Dep., 54:9). Officers Johnson and Rueda utilized this procedure because of Plaintiff's preceding violent behavior while Officer Gates proceeded to remove the leg restraints. (*Id.* at 49:1, 73:22-74:5); (Ex. 19, Lewis Email Statement); (Ex. 4, Reuda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1308_#11.avi" at time stamp 13:09:05) (showing Officer Gates bending down approximately twenty seconds after Plaintiff enters the cell); (Ex. 20, Gates Narrative, marked as AG 23) (admitting he was the officer who removed the leg restraints). Clearly, Officer Gates could not have lifted Plaintiff's foot and begun removing the restraints with Officer Rueda standing on them.

The officer or officers who put the leg restraints on Plaintiff actually put them on upside down. (Ex. 2, Green Dep., 45:21). And it was only after the Officers noticed this misapplication of the leg restraints in attempting to remove them that Plaintiff testified an unspecified officer began "twisting" the leg restraints, stepping on them." (Ex. 2, Green Dep., 45:21). However, the leg restraints were locked loosely enough that Officer Gates was able to "turn them" with no real force or effort. (Ex. 19, Lewis Email Statement).

The surveillance video shows that, after approximately forty five seconds, Officer Gates finished removing the restraints and stood back up. (Ex. 4, Reuda Dep. at ex. 7, UOF Video

Compilation folder, file "20100721_1308_#11.avi" at time stamp 13:09:50); (Ex. 20, Gates Narrative Report). Thereafter, Officer Gates proceeded to "scrape the floor [with his boot] to remove the clothes from the strip cell." (Ex. 4, Reuda Dep. at ex. 7, UOF Video Compilation folder, file "20100721_1308_#11.avi" at time stamp 13:09:50); (Ex. 20, Gates Narrative Report).

Again assuming the facts in the light most favorable to Plaintiff, at most, Plaintiff suffered a *de minimis* injury due to Officer Gates either having to twist the upside-down restraints to remove them or accidentally "scraping" Plaintiff's foot with his boot while attempting to remove Plaintiff's clothing. In any event, Officers Johnson and Rueda are entitled to qualified immunity on this claim because they did not personally participate in stepping on or twisting Plaintiff's leg restraints. Additionally, Plaintiff suffered no more than a *de minimis* use of force as evidenced by his only injury being a one-centimeter abrasion on his right ankle that, as of July 26, 2010, was "healing well." (Ex. 13, Smith Aff. at AG 456); *see Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (holding, in an unlawful arrest context, tight handcuffs that left red marks that were visible for days afterward is insufficient, as a matter of law, to support an excessive force claim if the use of handcuffs is otherwise justified).

Officers Johnson and Rueda are also entitled to qualified immunity on this claim because it would not have been clear to a reasonable prison official that the amount of force used in this situation to secure the threatening Plaintiff would have violated clearly established law. Plaintiff had just minutes prior disobeyed multiple orders to comply with his escort and attempted to kick Officer Johnson. (*see supra*, B.1). Although he had calmed down to the point where he stopped physically resisting, he continued to be verbally abusive and made threats of violence toward staff. (Ex. 10, Carrell Narrative Report); (Ex. 19, Lewis Email Statement). Even assuming Officer Rueda did step on Plaintiff's let restraints intentionally – a proposition for which Plaintiff

has produced no evidence – this amount of force, "even if objectively unreasonable under the circumstances, was not so far disproportionate to the perceived threat that it would have been 'clear to a reasonable officer that the conduct was unlawful in the situation he confronted.'" (*Avery*, No. 2:01-CV-763 TC, at 10).

In sum, because Officers Johnson and Rueda did not personally participate in stepping on or twisting Plaintiff's leg restraints, and because he suffered only a *de minimis* amount of force as evidenced by the one-centimeter abrasion, Plaintiff's claim is insufficient to support an excessive force violation. Additionally, because the force allegedly used was not so far disproportionate to the threat presented that it would have been clear to a reasonable prison official that this conduct violated Plaintiff's clearly established rights, Officers Johnson and Rueda are entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons Defendants respectfully request that the Court grant them qualified immunity on summary judgment.

Date: June 3, 2014

Respectfully Submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT

By:    s/ John Wesley Smith
       John Wesley Smith, No. 24935
       Assistant Attorney General
       120 SW 10th Ave., 2nd Floor
       Topeka, KS 66612
       Phone: 785-368-8423
       Fax: 785-291-3767
       E-mail: wes.smith@ag.ks.gov
       *Attorney for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

      This is to certify that on this 3rd day of June, 2014, a copy of the above and foregoing was filed with the Court via the CM/ECF system, which sends notice to counsel of record.

<u>/s/ John Wesley Smith</u>    

John Wesley Smith
